Filed 04/21/22

STATE OF VERMONT

SUPERIOR COURT                                    CIVIL DIVISION
Lamoille Unit                                     Docket No. 45-4-20 Lecv


BRUCE MILLER and LAURA MILLER,
        Plaintiffs

        v.

LLOYD TILTON and LISA TILTON,
        Defendants


## DECISION

This case concerns property rights between abutters, who are also relatives, that were created at the time of the subdivision of a former farm located on Route 109 in Cambridge. A site visit was conducted on October 19, 2021 and a final hearing was held on January 18, 2022. In February, the attorneys submitted proposed findings of fact and conclusions of law. Plaintiffs are represented by Attorney Brice Simon. Defendants are represented by Attorney William F. Grigas. Based on the credible evidence, the court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Deed references show that Wesley J. Miller and Evelyn Miller bought the farm in 1956. There is a very large dairy barn and milkhouse located on the property, apparently built in the 1950's. The Millers' homestead had frontage on Route 109 but was accessed by a driveway that came off Route 109.

In 1979, Wesley J. and Evelyn Miller conveyed to their son, Plaintiff Bruce Miller, and Sandra Miller a parcel from the farm described as approximately one acre,[1] together with spring rights and an easement. The parcel had frontage on Route 109 and was adjacent to the Wesley and Evelyn Miller homestead, but the access to the one acre lot was by easement on the driveway along the easterly edge of the lot conveyed, between the conveyed acre and the "former homestead premises of the Grantors herein [Wesley and Evelyn Miller]." The driveway came off Route 109 and led to the Grantors' former homestead premises and the large barn and milkhouse. The driveway appears to have been the major access into the farm property as well as to a cemetery within the farm property and to have become known at some point as "Evelyn's Way." The deed also conveyed the right to take water from "the water system which now serves the existing homestead premises on the northerly [apparently actually easterly] side of the driveway." There were additional detailed terms with respect to the right of repair, maintenance,

---

[1] The specific description is a parcel 210 feet wide and 210 feet deep, which is not exactly one acre.

and replacement with respect to the water line and the spring source to which it led and to related costs. "Said water right is intended for use in connection to a single family dwelling."

At some point Bruce Miller constructed and lived in a home on the lot acquired in 1979 described as one acre, and he apparently worked the farm. In 1982, Wesley Miller and Evelyn Miller conveyed additional farm acreage to Bruce Miller and Sandra Miller. By 2005, the residents of the house on the one acre lot were Bruce Miller and Laura Miller. The disposition and acquisition of ownership rights of both Sandra Miller and Laura Miller are unknown as there was no evidence about them.

By 2003, there was a plan that each of the Miller children would be able to acquire a piece of land from the former family farm. One of the children, Lisa, had married Lloyd Tilton. The Tiltons were interested in acquiring a parcel large enough for more than one house. Bruce Miller and Lloyd Tilton stood together on the farm property and pointed to where they intended the boundaries of a parcel for the Tiltons to be. They agreed that the parcel would be bordered on the east by the brook, and that the northern boundary, at the northeast corner of the parcel, would be southerly boundary of the one acre house lot owned by Mr. Miller. The large barn was also south of the one acre house lot. It was understood that the Tiltons' parcel would include the barn. Mr. Miller arranged for Harold Marsh to prepare a plan for purposes of conveyance of the parcel to the Tiltons.

Mr. Marsh prepared a "Plan of Subdivision." It is not in evidence, but it was attached to the Defendants' Answer as Exhibit A. It appears to show the acreage proposed to be conveyed to the Tiltons. It also shows a smaller adjacent parcel to the east (apparently the 6.43 parcel later occupied by Plaintiffs). It does not depict any buildings or features then on the ground. Accordingly, it does not show the location of the barn or the former homestead of Wesley and Evelyn Miller or the house on the one acre lot acquired by Bruce Miller, and it does not show the driveway off Route 109 or the location of the spring or water system. It only shows perimeter lines, and it does not show the boundary lines of the one acre lot previously conveyed to Bruce and Sandra Miller as a separate lot.

As such, it suggests that the one acre piece was in common ownership with the other acreage, and erroneously suggests that it was part of the parcel to be conveyed to the Tiltons. There is no evidence in the record of the status of the title after 1979 or 1982 of either of the parcels conveyed to Bruce and Sandra Miller at those times. Thus, the status of the title to either property in 2003 (and now) is unknown.

The east boundary drawn by Mr. Marsh did not follow the line of the brook that flowed south from Route 109 as the parties had intended (the brook was not depicted on the drawing), but was a straight line. This line also represented a common boundary with the adjacent parcel to the east. Although the timing is not clear, the evidence suggests that Bruce and Laura Miller created this as a 6.43 acre lot for themselves for a new home, and that they subsequently moved to a house on this lot.

2

By deed of April 18, 2005, Bruce Miller and Laura Miller[2] conveyed to Lloyd Tilton, Jr. and Lisa Tilton a parcel described as 27.79 acres. The parcel is also described as being shown on the Marsh survey, which was specifically referenced by date and noted as recorded in the Cambridge Land Records. The deed was explicit, however, in stating that excepting from the conveyance was the one acre parcel conveyed in 1979. Thus the actual acreage conveyed was closer to 26.79 acres. Other than the references to the Marsh survey and the 1979 deed of the one acre parcel, there is no other metes and bounds or other description of the boundaries of the property conveyed.

Mr. Tilton understood that the parcel he and Lisa Tilton were acquiring included the large dairy barn, and that the common boundary with the one acre lot was close to the barn, but he did not know exactly where the property line was. There were no surveys or other maps that showed the location of the barn in relation to proposed or established boundary lines.

The deed includes several other provisions related to the claims in this case:

Easement for Dairy Barn Repair. The Tiltons were also granted "an easement on the portion of the excepted one acre parcel abutting the former dairy barn on the premises conveyed for the purpose of repairing and maintaining said barn, and a right of access thereto for said purposes. . ." This provision makes it clear that the dairy barn was intended to be included in the conveyance to the Tiltons, but recognizes how close it was to the one acre lot, resulting in the necessity of an easement for the Tiltons to be able to enter the one acre lot for the purpose of repair and maintenance of the barn.

Easement for Right of Way. In negotiating terms of the conveyance, the Plaintiffs insisted on retaining an easement to be able to access their 6.43 acre parcel through the former farm, specifically from where the driveway left Route 109 and passed the one acre parcel[3] and led to the barn (Evelyn's Way), and then turned east on an existing gravel farm road and entered their 6.43 acre parcel. The Tiltons did not want their land to be encumbered by such an easement. An agreement was reached that the Tiltons' parcel would be subject to such an easement, but it would be for the benefit of Bruce and Laura Miller for only as long as they owned the 6.43 acre parcel. It would not be appurtenant to their 6.43 acre parcel beyond that, could not be conveyed to third parties, and would expire when they no longer owned the 6.43 acre parcel. The provision for this easement is set forth in the deed as follows:

> In addition to the rights and interests in land reserved to Grantors and their heirs
> and assigns as set out above in connection with the then unimproved one acres

---

[2] The source of Laura Miller's legal interest in the property was not established by evidence at trial. See subsequent footnotes.

[3] The owner(s) of the one acre lot held an easement over this portion of Evelyn's Way for driveway purposes as conveyed in the 1979 deed. There is no evidence in the record of the current owner(s) of the one acre lot, or of any change in the title to it since it was created in 1979. The evidence is that it is currently occupied by Bruce Miller's son Evan Miller. It can be inferred from the evidence that Bruce Miller still holds his interest in it. It is unknown if Sandra Miller continues to hold an interest in the property. There is no evidence that Laura Miller ever acquired a deeded interest in it although apparently she lived there at the time of the 2005 deed to the Tiltons. See the language quoted below from the 2005 deed concerning reservation of an easement by Bruce and Laura Miller.

3

parcel conveyed by Wesley J. Miller and Evelyn Miller, the GRANTORS herein reserve to themselves, personally, in common with the GRANTEES, and GRANTEES heirs and assigns, a right of way of ingress and egress, southerly from Vermont Route 109 past GRANTORS' present residence located on the one acre reserved parcel, past two barns and a portion of the "SMILIE CEMETERY" to the "Farm Road" and thence easterly along the "Farm Road" to the westerly boundary of a parcel of 6.43 acres, more or less, as shown on the above referenced survey. The GRANTORS interest in the right of way retained in this paragraph shall cease at such time as GRANTORS shall no longer own any interest in the 6.43 parcel.

Exhibit 1, Page 1. This language indicates that at the time of this conveyance in 2005, Bruce and Laura Miller were living in the residence on the one acre lot.[4]

Spring and Water System. In the deed to the Tiltons, the named Grantors (Bruce and Laura Miller) also purported to reserve:

to themselves, their heirs and assigns, all rights in and to the spring and water system which were not previously conveyed to Grantors in the Warranty Deed from Wesley J. Miller and Evelyn Miller to Bruce F. Miller and Sandra V. Miller dated September 30, 1979 and of record in Book 60, Pages 73-75 of the Cambridge Land Records., including but not limited to the spring, pipeline, the right to repair, maintain and replace the spring; the right to maintain, repair and replace the pipeline; and the right to enter upon the premises conveyed for said purposes. The spring supplying the water system is located westerly of the ten "existing home premises on the northerly side of the driveway" identified in the Warranty Deed of Wesley J. Miller and Evelyn Miller to Bruce F. Miller and Sandra V. Miller dated September 30, 1979 and of record in Book 60, Pages 73-75 and of the residence located on one acre parcel conveyed by Wesley J. Miller and Evelyn Miller to Bruce F. Miller and Sandra V. Miller in said deed.

Exhibit 1, page 2. This deed purports to reserve to Bruce and Laura Miller rights in the spring and water system not already conveyed to Bruce and Sandra Miller at the time of the deed of the one acre parcel. As set forth in the footnote above, there is no evidence that Laura Miller held a deeded interest in these residual rights, as there is no evidence that Laura Miller held a deeded interest in the whole of the 27.79 acres that was being conveyed to the Tiltons.[5]

Land Use Value Program. The deed referenced the enrollment of the parcel conveyed in the land use value program for reduced property taxation for land used in farming. It is clear that

---

[4] The deed to the Tiltons was also subject to driveway and farm road easements for farming purposes only that had previously been conveyed to Gervais Family Farm, Inc. Those rights are not at issue in this suit.

[5] It is possible that Laura Miller did hold such a deeded interest, as she signed the deed and warranted that she was an owner, but it was not in evidence in the trial.

4

it was the intent of the deed that the property would continue to be eligible for the program, but that if the parcel became ineligible, the Miller Grantors would have no liability for the land use change tax:

> The premises conveyed are enrolled in the Agricultural and Managed Forest Land Use Value Program. This conveyance is made subject to any and all land use change taxes or liens in favor of the State of Vermont arising under 32 V.S.A. §3751 et seq. as a result of the enrollment of the property in that program. The Grantees assume and agree to hold Sellers harmless from the lien and any liability for said land use change taxes which may arise under the Agricultural and Managed Forest Land Use Value Program.

Exhibit 1, page 3. Mr. Tilton testified at trial that removal or loss of acreage could result in ineligibility for the program. He testified that two 2-acre portions have already been removed, although the exact amount of acreage is not in evidence and it appears from Exhibit 16 that it could be less as the "doublewide" lot appears to be only 1.13 acres.

> Covenants. The deed contained the following covenants:

> The above described premises are conveyed subject to the following covenants, conditions, and restrictions which run with the land and are binding upon Grantees and their heirs, successors and assigns:

> 1. The premises shall not be subdivided into more than four lots.
> 2. Not more that [sic] one single family residence shall be permitted on each lot.
> 3. No residences, other than single family residence shall be permitted on a lot.

Exhibit 1, page 3.


After acquiring the 26.79 +/- acre piece, Lloyd Tilton applied for a permit to construct a waste water system for a second residence on the acquired land. The permit was granted in January of 2006.

It appears that during the period from 2005 to 2014, Bruce and Laura Miller moved to their new residence on the 6.43 acre lot and the Tiltons constructed a residence for themselves and a second residence ( referred to as "the doublewide") on the 26.79 +/- parcel. The second residence was located in the vicinity of where the Wesley and Evelyn Miller's former homestead had previously been (it was gone), but there is no evidence as to a specific location. Bruce and Laura Miller were still living in the residence on the one acre lot when the Tiltons installed the septic system for which the permit had been obtained. The permitted system was designed to be placed in the vicinity of the location of the spring and water system acquired by Bruce Miller from the 1979 one acre deed and purportedly reserved by him and Laura Miller in the deed to the Tiltons. The Millers could easily see that the system was being constructed on that site. They raised no issues about it.

5

The Tiltons used the barn for agricultural purposes and insured it. The Millers used their reserved easement for access to their 6.43 acre property. (The location of their right of way is outlined in red on Exhibit 8.) The farm road portion had previously been graveled and used for farm equipment. Neither the Tiltons nor the Millers maintained it as a graveled road, and it reverted to grass, but the Millers used it and the Tiltons mowed the grass as part of mowing surrounding lawn. Lloyd Tilton likes to keep his lawns well-groomed and he did not like the Millers having or using the easement on what he considered to be his land. In mowing his fields, from 2005 to 2014, he mowed only to the brook, which he understood was the boundary between the Tilton parcel and the Millers' 6.43 acre parcel.

In 2014, the Tiltons were planning a subdivision for the doublewide to be on a separate lot, and they had a survey done in preparation. See Exhibit 16. This plan depicted all existing structures and features on both the one acre lot and the Tilton land. It showed that the boundary line between the one acre parcel and the Tilton land cut right through nearly the center of the large barn at an angle. It also depicted the common boundary between the Tilton parcel and the Miller 6.43 acre parcel to the east as a straight line rather than a line that followed the brook; at some point along the line it began to run a few feet to the east of the centerline of the brook.

Lloyd Tilton concluded from the survey that he and his wife owned more land than he had previously thought, and told Mr. Miller about this and began to extend his mowing to include a strip of land a few feet wide to the east of the brook, thereby asserting ownership. This is visible in the photograph admitted as Exhibit 8.

Tensions developed between the parties over several issues. Mr. Tilton did not like the Millers using their easement on Evelyn's Way and the farm road, which had become grass. Mr. Miller was a school bus driver, and sometimes used the easement to drive the school bus to his property to park it overnight on his 6.43 acre home parcel. Although he has a separate access drive to his house from Route 109, the turn for the school bus is easier when he uses the right of way. Mr. Tilton did not like the bus passing through his land or the marks it made in his groomed and mowed field, and he tried to stop Mr. Miller from driving the bus on the easement. Mr. Tilton claims that the Millers damaged his land with the bus. The photos on which he relies to claim damage to Tilton land show the normal kind of temporary muddy ruts that develop in the spring when the ground is wet and vehicles drive on a field, but the ground dries out as the water table lowers. This is a predictable consequence of use of a right of way on grassy land. The ruts shown in the evidence photos are typical temporary consequences of spring driving on wet soil, and do not constitute damage to the land.

The Tiltons told the Millers' grandchildren not to use the easement to go to and from their grandparents' house. Laura Miller wants them to be able to use that access route rather than walk on Route 109. The Millers thought the Tiltons should maintain the right of way as a graveled farm road, as it had been before, whereas the Tiltons did not want them to use it at all.

6

Bruce Miller testified in a general way that the spring rights conveyed to him in 1979 were located where the septic system is now, but there was no specific identification of where the spring or water system was actually located on the ground compared to the current location of the septic system constructed by the Tiltons. The testimony was vague, conflicting, and inconclusive as to where on the ground the original Wesley and Eveylyn Miller homestead was and where the spring is and what pipes were where and the configuration of those features in relation to the physical layout of the current septic system. There was no actual description of what the "water system" consisted of. Laura Miller testified that if they were unable to use the spring rights, it would cost $10,000 to dig a well, but she acknowledged that this was an estimate based entirely on the expense someone else incurred to dig a well at a different location.

The Tiltons' son and grandson live with them in their residence. The son and grandson occupy the ground floor, which has a kitchenette and an exterior door. There is no lease and they do not pay rent or utilities. Laura Miller checked the listers' card at the Town Clerk's office and found that there is a "note" that says "2018 Added apt finish." The Millers believe that the Tiltons are in violation of the covenant that only single family residences are permitted, as Ms. Miller believes that a "single family" consists of parents and children, and does not include extended family members.

When the Tiltons plowed the driveways on their property, they plowed the snow into piles that obstructed the Millers' easement access to their property over the farm road. They also parked a van and a car in a manner that obstructed the Millers' access to their property via the farm road.

Tensions ran especially high in the summer of 2021. Mr. Tilton's father visited for an extended period of time and hooked his RV up to the septic system on the Tilton property. The Millers complained to the Environmental Compliance Division of the Vermont Agency of Natural Resources. An investigator visited the property and said that the hookup was a violation, and needed to be disconnected. Mr. Tilton disconnected the hookup. Mr. Tilton testified that it was at this time that the Millers raised their complaint for the first time about the septic system having been constructed on the site of the spring rights, even though the septic system had been visibly constructed on that site in 2006, 15 years earlier. However, the Millers asserted a claim to spring rights in the original complaint in this case, which was filed prior to the summer of 2021.

The Tiltons have kept the barn locked and do not allow the Millers to access the portion of the barn that is within the boundary lines of the one acre lot. They maintain security cameras on the barn. Both parties are amenable to shifting the property boundary so that the barn is entirely on Tilton land rather than straddling the two properties. The Tilton's concern is whether that would jeopardize eligibility for the land use value program if an adjustment would diminish their acreage to such an extent as to trigger the land use change tax.

At the conclusion of the trial on January 18, 2022, the parties were to explore whether they could do a boundary line adjustment to avoid having a boundary line cutting across the barn without triggering land use change tax liability. There has been nothing filed indicating that anything has been done on this issue.

## Conclusions of Law

Based on the foregoing Findings of Fact, the court makes the following Conclusions of Law based on the law applicable to the Plaintiffs' claims.

*Boundary Lines; Reformation of Deed*

Plaintiffs claim that the terms of the deed conveyed to Defendants contain a mutual mistake, and seek reformation of the deed. The applicable law is set forth in *LaRock v. Hill,* 131 Vt. 528 (1973) as follows: "[I]n an action for the reformation of a deed on the basis that the deed does not represent the actual conveyance intended by the parties, the plaintiff has the burden of establishing that there existed, previous to the deed, a valid agreement representing a standard to which the erroneous writing can be reformed, so as to express the true transaction between the parties." *LaRock* at 530. The burden is on the party seeking reformation to establish the true agreement to which the deed is to be reformed. *Id.*

The Findings of Fact show that Plaintiffs have met this burden. There is no disagreement between the parties that the intent of the 2005 deed was to convey a parcel with a boundary located such that the barn was wholly within the parcel conveyed to the Tiltons, even though the barn was close to the boundary line. The evidence also establishes that the eastern boundary was to follow the line of the brook. The terms of the deed itself confirm that the barn was intended to be conveyed to the Tiltons, as it references the barn but only for the purpose of granting an easement exclusively for purposes of maintenance and repair. After the conveyance, both parties acted in conformance with their agreement, and not the deed or Marsh drawing, for the next 9 years: the Tiltons used the whole barn and insured it, and the Tiltons mowed only up to the brook and not beyond, believing that the brook was the boundary.

Plaintiffs have proved grounds for reformation based on mutual mistake, and based on having proved the terms of the true agreement between the parties. The mistake was a mutual one, as both parties believed that the deed conformed to their agreement, when it did not. Both parties are equally responsible for having apparently not paid close enough attention to the accuracy of the Marsh plan and the deed, and for having completed a real estate transfer that was not in accordance with their agreement. Therefore, the costs of reformation are to be borne equally by the parties.

Further work will be necessary to issue a judgment reforming the deed. The court will schedule a status conference to identify the necessary steps. The parties are encouraged to seek to identify specific locations for boundary adjustments to accomplish this task. Plaintiffs seek to acquire additional land from the Tiltons to make up for any

8

loss in acreage due to adjustment of the boundary line close to the barn, but the court concludes that reformation of the deed does not compel that Plaintiffs are entitled to compensation acreage.

*Plaintiffs' Easement*

Pursuant to the deed, the Plaintiffs hold an easement for access to their 6.43 acre parcel from Route 109 through Defendants' property along Evelyn's Way and then turning east on the former farm road to their parcel. As a result of the disagreements that have developed over use and maintenance of the easement, both parties have requested clarification of their respective rights and responsibilities.

The easement is described in the deed as "a right of way of ingress and egress." Although the word easement is not used, courts typically treat a grant of a "right of way" as the grant of "an easement for passage over a described strip of land." Bruce and Ely, *The Law of Easements and Licenses in Land*, §1:24 (2022). The use permitted for the easement is for ingress and egress, and is not limited in any other way as to use. For example, there is no limitation as to the type of vehicle used for ingress and egress.

"[P]arties are deemed to have contemplated the easement holder's right to do whatever is reasonably convenient or necessary in order to enjoy fully the purposes for which the easement was granted." *Id.* at §8:3 (Citations omitted.) The use of a right of way for ingress and egress means the easement may be used by any one who has a valid reason to use it for access to the Millers' 6.43 acre property. This includes use by others invited to or needing access to the Plaintiffs' land such as family members, invitees, tradespeople, public officials, etc. in addition to the Plaintiffs themselves. "Reasonable purposes also include use by tenants, guests, and invitees of the dominant estate owner." *Id.* at §8:4. Use is not limited to only Bruce and Laura Miller as individuals. However they cannot give the right to anyone else or pass it on to a buyer, and the easement right terminates when they no longer own their 6.43 parcel.

There are no other restrictions on the *manner* in which it may be used as long as it is used for the purpose of ingress and regress to the 6.43 acre parcel. In other words, the Tiltons, although they have the right to use the right of way themselves and mow it, have no right to restrict Mr. Miller from driving his school bus or any other type of vehicle on the easement for access to his property. "Although the servient owner is entitled to use the servient land, the owner may not unreasonably interfere with the easement holder's enjoyment of the servitude. Unreasonable interference with an easement holder's use of the servient estate constitutes an infringement upon a valuable property right." *Id.* at §8:21. The Tiltons have no right to restrict Miller family members, such as grandchildren, or any other pedestrians going to the Millers' 6.43 acre parcel, from using the easement for access or departure.

Although the strip of land defining the easement was a graveled farm road at the time the easement was created, there was no express term requiring the Tiltons to maintain it as a graveled road. It is fine for them to allow it to revert to grass, and they

9

may mow the grass, as long as they do not obstruct passage over the easement. On the other hand, the Millers have the right to repair and maintain the easement, and the obligation to repair if their use causes damage. *Id.* at §8:37. Thus, they may apply gravel at their own expense in conjunction with their access use, and they are responsible for repairing any non-temporary damage.

The Tiltons do not have the right to pile snow or park vehicles on the easement route. They have the legal obligation to leave the strip of easement land unobstructed for use by the Millers for ingress and egress until termination of the easement when the Plaintiffs no longer own the 6.43 acre parcel.

*Covenant for Single Family Residences*

The Tilton family residing in their residence includes their son and grandson. It is not uncommon for family groups to include multigenerational members. The concept of "family" is not limited to one generation of parents and their offspring. The evidence is that neither rent nor utility expenses are charged or paid by the son for himself and his child. In addition, there is insufficient evidence to prove that the downstairs portion of the house is permanently blocked off from the upstairs to create structurally separate units with no possibility of interaction within the house. Despite the existence of a kitchenette and external door downstairs, the credible evidence is that the situation is comparable to that in which a wing of a house or a bedroom area is used primarily by certain members of a family on a semiprivate basis but without restricting access by other members of the family unit and without actually breaking the house in to separate units. Plaintiffs have not shown that the Defendants have violated the covenant provisions requiring that residences on the property be single family residences.

*Spring and Water System*

Plaintiffs have the burden of proof to show that both of them hold a present legal interest in the spring and water system, that Defendants have damaged the spring or their access to it and/or the water system, and that protection of their rights calls for an order mandating restoration of the access to the spring and water system or proof of the amount of compensation they are entitled to as a result of loss.

While it may be reasonably inferred from the evidence that Bruce Miller holds such rights, Plaintiffs have not proved that Linda Miller actually holds a legal interest in the spring rights at issue, as there is insufficient evidence of deeded rights to her of either the spring rights that were conveyed to Bruce and Sandra Miller in the 1979 deed or of the spring rights that were retained by Wesley and Evelyn Miller in that deed. The chain of title of such rights has not been proved.

In addition, the specific location of the spring itself and the components and location of the "water system" referenced in the 2005 deed have not been sufficiently identified. On the site visit, a general area was pointed to, with no specificity as where the spring, the components of the "water system," and the septic system are actually located

10

in relation to each other. While the septic system is shown on one admitted exhibit, there is insufficient documentary evidence of the specific location of the spring or water system, or the location of these items in relation to the placement of the septic system. The testimonial evidence was only that the spring was in the same general location as the septic system, but without specific proof of location.

There was no evidence of what the "water system" consists of, or the distance of either the spring or the water system from the boundary between the one acre parcel and the remaining land conveyed in the 2005 deed. As a result of lack of evidence, the court does not have a sufficient factual basis for determining that the installation of the Tiltons' septic system damaged the spring or "water system."

Even if it were to be considered that a general indication of location were enough from which reasonable inferences could be made that the "water system" was affected by the installation of the septic system (about which there is no specific evidence), there is still insufficient factual information about the system itself or the spring, what it provided, and what would be needed to restore or replace it. Moreover, the evidence as to damages was insufficient to meet the Plaintiffs' burden of proof as to the cost representing damages. The $10,000 figure was unreliable evidence based on hearsay from a third party as to what it cost that person to dig a well at an entirely different location with potentially different ground water conditions. Proof of damages is insufficient.

Plaintiffs' claim regarding damage to spring and water system rights has not been proved. Judgment will be granted to Defendants on this claim.

### Order

A status conference will be scheduled to address the practical steps needed to complete reformation of the deed. No final judgment will issue until that is completed. The final judgment shall be based on the foregoing Findings of Fact and Conclusions of Law.

Electronically signed pursuant to V.R.E.F. 9(d) on April 21, 2022 at 1:12 PM.

Mary Miles Teachout
Mary Miles Teachout
Superior Court Judge

11